In The

## Court of Appeals

## Ninth District of Texas at Beaumont

_____

### NO. 09-21-00384-CV
_____

### EBER FLORES AND JAIME FLORES, Appellants

### V.

### MARIA OCHOA, Appellee

**On Appeal from the 457th District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-04-04563-CV**

### MEMORANDUM OPINION

Eber Flores and Jaime Flores (the Floreses or Appellants) challenge the trial court's judgment awarding Maria Ochoa past medical expenses following a car accident between Eber Flores and Maria Ochoa.[1] On appeal, the Floreses do not

---

[1] Jaime Flores is Eber Flores's brother and Jaime gave Eber permission to drive Jaime's vehicle on the day of the accident. Eber did not have a driver's license, and Jaime knew Eber did not have a driver's license. A jury found Eber and Jaime each 50% responsible for causing or contributing to Ochoa's injuries.

1

dispute their liability in causing the car accident, but dispute whether Ochoa's medical damages and expenses were caused by the car accident. In three issues, the Floreses argue that the trial court erred in allowing causation evidence to be introduced by experts not properly disclosed in compliance with Texas Rule of Civil Procedure 194.2(f)(3), that absent the disputed testimony, the evidence is legally insufficient to support the damages awarded for past medical expenses, and finally that the trial court erred in allowing Ochoa to recover her litigation expenses as taxable court costs.[2] Because both lay and expert medical evidence introduced at trial was sufficient to prove causation under these facts, we affirm that part of the trial court's judgment, but we reverse and remand on the issue of taxable costs.

## I. Background

Due to the limited scope of the issues on appeal, we address only the background facts necessary to resolve Appellants' issues. In March 2019, Eber Flores was driving his brother Jaime Flores's vehicle when he collided with Ochoa.

**Maria Ochoa**

Ochoa described her health before the car accident as "normal[,]" testifying that although she is diabetic and has hypertension, she did not have "pains." Ochoa stated that about a decade prior, she had a slip and fall accident at a hospital, but she

---

[2] This lawsuit was filed March 29, 2019. This rule was amended in January 2021 and again in September 2023. Section 197.2(f) was removed in subsequent amendments. *See* Tex. R. Civ. P. § 194.2; *see* Tex. R. Civ. P. § 195.5(a)(3).

did not injure her back, only her "side." According to Ochoa, she received therapy for the slip and fall accident. Ochoa testified that her response to interrogatories stating she injured her back in the slip and fall accident was incorrect.

Ochoa testified that immediately after the accident with Eber Flores, she began to experience pain in her back, leg, arm, and shoulder. After leaving the accident scene, she felt "bad[,]" prompting her to take painkillers and blood pressure medicine that day. Ochoa did not seek treatment for her pain the next day, but she did stay at her son's home for a week, stating she could not stay longer because of pain in her knee and back. On March 27, Ochoa sought medical attention at North Houston Pain and Spine. At that time, Ochoa reported that she had pain in her arm, leg, neck, and shoulders. She received X-Rays, therapy, hot patches, and treatment on her knee. A week later, Ochoa went to another facility where she complained of headaches, neck, back, shoulder, elbow, and knee pain. Here, Ochoa received pain medication and was sent to get MRIs. According to Ochoa, based on the results from her MRI, she was told that she needed "a lot of therapy[,]" and that she had "lesions, [and] some injuries[.]" Ochoa continued her therapy at North Houston until June, when she reported a pain level of "4 out of 10[]" at her final visit. North Houston then found a place in Edinburg where Ochoa could continue her therapy. During cross-examination, Ochoa disputed North Houston's patient notes that stated Ochoa

3

was "released from care at this time and will continue with home therapy regimen[,]" stating instead that she was "transferred to Edinburg[]" and not released from care.

In Edinburg, Ochoa received treatment at Patterson Chiropractic. At Patterson, Ochoa received therapy and a series of exercises, and was referred to a pain management clinic, called Texas Pain Clinic. At Texas Pain Clinic, Ochoa testified that she complained of a pain level of "7 to 8 out of 10" in her neck and she received a steroid injection in her neck to help the pain. Ochoa stated that the steroid injection reduced the pain, but it did not completely resolve it. Ochoa was then prescribed pain medication. Ochoa testified that she then went to Mexico to see a "traumatologist" because she could not afford to keep seeing her doctor in the United States. Ochoa remained in Mexico for fifteen days, receiving therapy.

Ochoa testified that she still takes pain medication. She still experiences headaches, back, neck, knee, and shoulder pain. According to Ochoa, she has experienced reduced activity since the wreck, specifically, she cannot exercise, walk "a lot[,]" or pick up heavy objects. At the time of the accident, she was working as her brother's caregiver in Spring, a job she feels she can no longer do. Ochoa testified that she cannot sleep and does not want to drive, due to her fear of driving. Ochoa acknowledged that she has not been placed on any restrictions from a doctor. Ochoa testified as to her medical bills and associated costs for each service she received.

**Dr. Timothy Runnels**

Doctor Timothy Runnels described his educational background as a chiropractor and stated that he currently works at North Houston Spine & Sports Medicine, a facility he owns and runs. Runnels treated Ochoa at North Houston in 2019. He stated that Ochoa arrived at North Houston in late March 2019, complaining of headaches and pain in her neck, upper back, right shoulder, right elbow and right knee. Ochoa told Runnels that she had been in a car accident on March 8, 2019. Runnels performed an examination on Ochoa and noted the findings below:

> [W]hen we did cervical compression tests, we had increased radiating pain to the right shoulder that extended down to the right hand. When we did the shoulder depressor orthopedic test, it was positive on the right, which also caused increased radiating pain to the right hand area. In regards to the lumbar spine, when we did the lumbar orthopedic test, we did Lasegue's, which is otherwise known as straight-leg raise. We had a positive on the right, which caused increase in low back pain, and again right-sided increase in radiating pain that went past the knee. And let's see. In regards to the right shoulder, we had a number of positives, including we had a Yergason's on the right was positive, we had anterior apprehension test on the right, and right bicipital instability. In regards to the knee, we had a positive as far as Apley's compression, we had a positive as far as knee diffusion or swelling, and patella apprehension on that right side.

Based on these findings, he recommended a course of care that would require Ochoa receiving treatment at North Houston three times a week for six weeks, including "adjustments … stretching and electric muscle stimulation." Runnels continued treating Ochoa until June 2019, stating that her pain was not gone, but

5

"certainly improved[.]" Runnels also sent Ochoa to get an MRI, explaining that he sent Ochoa for a medical consultation and both he and the medical doctor recommended Ochoa get an MRI. The MRIs on her cervical and lumbar spine revealed the following:

> Okay. I'm turning to the cervical MRI report, and the radiologist found that she had multiple levels of disc herniation, in other words, disc injuries into the -- at multiple levels of the cervical spine. At C5-6, she had a two-millimeter disc herniation and also we saw the herniation at C6-C7. Also at C3-4, she had an annular tear, which is significant because it is, it points to a new or acute injury such as a recent car accident.
>
> . . .
>
> All right. Lumbar MRI, we had -- what is it -- three levels where she had disc herniations, at L3-4, at L4-5, and L5-S1. And these were between one-millimeter and two-millimeter disc injuries. And once again here, we're seeing that she had some -- especially between L-4 and 5, seeing some -- what is it -- pressure on the thecal sac, which is more concerning in regards to it being more of an acute process.

At the end of Ochoa's treatment, Runnels observed that she had improved post-treatment with her range of motion, but noted the prognosis remained "guarded." He released her from treatment for her right knee and right shoulder. He recommended a referral to a pain management clinic to address the disc injures in her spine. Runnels opined the accident on March 8th caused Ochoa pain, and "that her injuries are consistent with people that have had – our other patients that we've, again, treated over the last so many years, it's consistent with people that have been in a similar collision to what she described." During cross-examination, Runnels

6

disagreed that Ochoa's diagnosis was strains and sprains, or that it was related to degenerative changes. While he agreed that Ochoa had some of these conditions, including sprains and strains in her shoulder and knee along with some degenerative changes associated with aging, that was not her primary diagnosis for her cervical and lumbar spine. Runnels also testified about the total charges for his services and that the treatments were reasonable in the field of chiropractic and were necessary to treat Ochoa. The medical and billing records were admitted as evidence.

**Dr. Jorge Saenz**

Doctor Jorge Saenz testified that he is a pain management doctor and board-certified interventional/diagnostic radiologist. Saenz detailed his educational and professional background and stated that he is employed at Texas Pain Clinic. Saenz first examined Ochoa in July 2019. At her first visit, Ochoa told Saenz that she had been in a car accident in March 2019, had received treatment by a chiropractor, but was referred to Saenz because she was still experiencing pain. Saenz examined Ochoa and found the following conditions:

> We examined her neck, which showed a lot of pain when palpating the posterior aspect of the neck. There was a lot of spasm in her muscles and there was limited flexion and extension on her neck. Her lumbar exam demonstrated that she had straightening of her lumbar curvature, which is loss of lordosis, there was spasm in her musculature, and also point tenderness over the posterior aspect of the lumbar spine. The patient also showed that she [had] limited range of motion with flexion and extension, and she had positive straight-leg raise exams, which typically those are exams where you raise the leg and it elicits a shooting pain down the leg.

7

Saenz reviewed Ochoa's MRIs ordered by Runnels and determined that "[i]n her lumbar spine, she had a grade 1 anterolisthesis, which is basically the vertebra [at one level] is moved just a millimeter [or] two relative to the vertebra below it." According to Saenz, this condition "can be caused by trauma[.]" His review of her cervical MRI revealed herniations and annular tears of the discs. His overall assessment was that Ochoa "had cervical disc disease and radiculopathy, meaning she had injury to the disc, causing pain to both the neck and low back and that was radiating to her arms and legs." He recommended Ochoa receive an epidural injection of both her neck and low back. He described the pain Ochoa was experiencing was "acute, meaning . . . recent[,]" and he believed it was caused by her car accident in March 2019. Saenz further testified that he was unaware of and did not evaluate the effects of a prior injury Ms. Ochoa had testified about at trial:

Q. In this particular case, were you aware that the patient had a prior accident?

A. No.

Q. Is that something that you ask about and expect the patient to tell you about?

A. We usually expect them to tell us if they had a prior injury or not.

Q. And --

A. Is the routine.

Q. And the patient didn't disclose any prior injury to you. Correct?

8

A. Correct.

Q. Okay. This is from her interrogatory answer, Number 7, "I had a slip and fall at a hospital. I injured my back. I got an MRI done, and I experienced a herniated disc." Is that important information for you to know?

A. It would be important to know if we had, yeah, copies or comparisons. It wouldn't change my opinion, though, because my opinion is based on my physical and my history. It's not just based on an MRI or -- or anything like that.

Saenz also explained the medical expenses his facility charged and stated that the charges were reasonable and necessary for Ochoa's treatment.

During cross-examination, Saenz testified that he did not see any indication of degenerative changes, such as arthritis, on Ochoa's MRI. He explained that it is not uncommon for a patient to have multilevel herniations from an auto accident. But he admitted he was unaware of Ochoa's previous slip and fall accident. He stated the MRIs from Ochoa's slip and fall accident would not change his opinion because his opinion is based on history and a physical examination.

**Dr. Omar Vela**

Doctor Omar Vela testified he is a chiropractor and that he works at Patterson Chiropractic Clinic in Edinburg. Vela described his educational background and stated that he treated Ochoa for a month, from July to August 2019. He testified that when Ochoa came to his facility, she complained of "neck pain on both sides, bilateral neck pain, pain in the bilateral -- bilateral mid back, and lower lumbar pain

9

bilaterally, and also had headaches, described as dull headaches[,]" stemming from the March 2019 accident. He explained, based on Ochoa's complaints of continuing pain, that he had recommended a therapy treatment plan of three visits a week for three to four weeks, manipulation of her spine to mobilize the joints to prevent scar tissue, electrical muscle stimulation to help relax her muscles, and heating pads and massages. He stated that he reviewed her MRIs and noted that she had a "disk herniation[,]" annular tears, which he opined were "trauma-induced" from a situation like a car accident. When he released Ochoa from care in August 2019, he said her condition was "guarded[,]" meaning he was "unsure of [her condition] at the time[,]" and he recommended that she "follow up with the [] pain management doctor and be under his supervision." Vela also testified as to Ochoa's medical expenses, and he concluded that the medical expenses were reasonable and necessary for her treatment.

During cross-examination, Vela confirmed that Ochoa's "cervical sprain/strain" would be soft tissue injuries and "could" be termed whiplash in layman's terms. According to Vela, Ochoa's soft tissue injury could take up to six to eight weeks to heal. Vela stated that annular tears are not caused by aging. Vela confirmed that Ochoa did not disclose her slip and fall accident to him, noting that if he had that information, he could have compared the MRIs from the slip and fall

10

case and her car accident. Vela stated that based on Ochoa's injuries, "[i]t does not surprise me[]" that Ochoa still complains of pain in her neck.

**Dr. Howard Derman**

In a recorded deposition, Doctor Howard Derman testified as a retained expert for the defense. He stated that he is a board-certified neurologist with forty years of experience, employed by Methodist Hospital, and that he works with neurology residents in an indigent clinic in downtown Houston. He described his educational background and experience, testifying that he has treated "many, many patients involved in automobile accidents[.]" Derman testified that he had reviewed Ochoa's medical records and formulated an opinion based on those records. He described Ochoa's medical history after the accident, stating the following about her treatment:

> Sending the patient to the first chiropractor was a reasonable move. I had major problems with the number of treatments. Clearly in the chiropractic literature, it is recommended that if the patient is not showing improvement after 9 to 12 visits, depending on which recommendations you believe or follow, that no further treatments should be undertaken. So my issue is with the number of treatments, which, in this case, far exceeded 12. She had -- if you count both together, she had 35. So there was no reason to send her for that many visits. So it was okay to send her to the initial treatment plan for up to 12 visits, but all visits after that were not recommended and should not have been pursued.

He stated that the arthritis in Ochoa's back was a preexisting condition, noting that Ochoa is a 62-year-old woman, and that the arthritis was found at "five different levels." According to Derman, Ochoa's injuries were unrelated to her accident.

11

The automobile accidents, if they do cause the trouble in the spine, typically are at one site and are related to pinching of a nerve. And when you see abnormalities, both in the neck and the back at five different levels, there is no doubt that it is unrelated to the automobile accident. And when you see narrowing of the canal, slippage of the spine, those again are issues that develop over time. So in this case, it's clear-cut that this is unrelated to the automobile accident and is degenerative in nature.

During cross-examination, Derman testified that some of Ochoa's anterolisthesis could be caused by a car accident, but stated that "more likely than not," it was not caused by the accident when you see it "associated with arthritis above it and below it[.]" He stated that a person cannot experience herniations in multiple discs in both the back and neck because of a car accident.

**Dr. Brad McKechnie**

Doctor Brad McKechnie testified via recorded deposition for the defense. He stated he is a Doctor of Chiropractic Medicine and described his education and professional background, including testimony that he is board certified and has been practicing for thirty-four years. McKechnie stated that although he did not treat Ochoa, he reviewed her medical records. According to McKechnie, Runnels diagnosed Ochoa with conditions that she did not have, and treated her "in a manner exactly opposite of what [a chiropractor] should have done[]" if Ochoa had the conditions Runnels diagnosed. Based on his review of Ochoa's MRIs, he believed Ochoa has "degenerative disc disease[,]" that preexisted the accident.

The MRIs were done 62 days after the accident, and the cervical MRI, if you take the 30,000-foot view of what was there, the MRI findings are describing what we consider multilevel cervical degenerative disc disease, which would be consistent with the patient's age of 62 years.

. . .

That's the normal wear and tear that happens to a spine. The discs, which are the shock absorbers that park themselves between the vertebrae, lose their ability to perform as shock absorbers because they dry up. And the MRI mentioned the term "disc desiccation," which means that the disc water content is going away. Then the discs themselves start to flatten out, they bulge, and bone spurs firm -- form around the edges at each segment. And the MRI report did describe mild spondylotic changes involving the cervical spine. That means bone spurs. And they describe disc desiccation, which is the drying up of the disc because of the degenerative process. And then they cited the presence of disc issues at C3-4, 4-5, 5-6, and 6-7, which are consistent with the degenerative disc disease that's already there.

Mckechnie testified that any treatment beyond the first six weeks at North Houston was not "necessary or clinically justifiable[.]" Any treatment past that point did not create "meaningful clinical benefit" for Ochoa and any changes were "simply a case of you get far enough downrange from an accident in terms of time passage, you naturally feel better." Regarding Dr. Vela, he opined that the treatment was unnecessary as "simply because they didn't do, really, anything ostensibly different than the first chiropractor did, and the first chiropractor's treatments stopped working, if you will, after the first two, three weeks of care." He concluded that Runnels's medical billing was necessary for the amount of $2,254, but Vela's medical billing was unnecessary and worth "[z]ero dollars."

13

At the end of trial, the jury found that both Jaime Flores's and Eber Flores's negligence caused Ochoa's injuries and awarded Ochoa damages for past physical pain, mental anguish, physical impairment, and reasonable and necessary medical expenses.

## II. Issue One

In their first issue, the Floreses contend that the trial court erred by allowing Ochoa to introduce evidence on causation from Dr. Saenz and chiropractors Runnels and Vela, because their opinions were not properly disclosed in compliance with Texas Rule of Civil Procedure 194.2(f)(3). *See* Tex. R. Civ. P. § 194.2(f)(3).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527–28 (Tex. 2000). In determining whether the trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding principles or rules. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court does not abuse its discretion if some evidence of substantive and probative character exists to support the trial court's decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *Ayala v. Ayala*, 387 S.W.3d 721, 728 (Tex. App.— Houston [1st Dist.] 2011, no pet.).

With respect to the discovery of experts, the Rules of Civil Procedure impose a disclosure obligation on the party that seeks to introduce testimony from expert

witnesses. *See* Tex. R. Civ. P. 194.2(f), 194.3. In pertinent part, Rule 194.2(f) provides that upon a proper request for disclosure, the responding party is required to disclose for testifying experts:

> (1) the expert's name, address, and telephone number;
> (2) the subject matter on which the expert will testify;
> (3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;
> (4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party:
> > (A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and
> > (B) the expert's current resume and bibliography[.]

Tex. R. Civ. P. 194.2(f); *see also* Tex. R. Civ. P. 194.3.

Rule 194.2(f) of the Texas Rules of Civil Procedure provides that upon request, a party may obtain disclosure of the general substance of a testifying expert's mental impressions and opinions, as well as all documents and tangible things that have been provided to or reviewed by the expert in anticipation of the expert's testimony. Tex. R. Civ. P. 194.2(f). The purpose of Rule 194.2(f) is to give the opposing party sufficient information about the expert's opinions to allow the opportunity to prepare for a meaningful cross-examination and expert rebuttal evidence. *Pro Plus, Inc. v. Crosstex Energy Servs., L.P.*, 388 S.W.3d 689, 705 (Tex. App.—Houston [1st Dist.] 2012), aff'd, 430 S.W.3d 384 (Tex. 2014).

15

The parties do not dispute that Ochoa's medical providers were not retained experts. Therefore, the rules require that Ochoa provide the Floreses with "the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information." *Id*. In Plaintiff's First Supplemental Response to Defendant's Request for Disclosures she identifies Dr. Saenz, Dr. Runnels and Dr. Vela and states that each "is the attending physician of Plaintiff and is expected to testify as to the reasonableness and necessity of medical care and medical bills in addition to causation of Plaintiff's damages."

During the pretrial hearing, the Floreses' counsel informed the court he was going to raise Rule 194 disclosure objections to Ochoa's experts, eventually leading to the following colloquy:

> THE COURT: What about Dr. Saenz? Is he a retained expert?
> [OCHOA'S COUNSEL]: He's a treating physician, Your Honor.
> THE COURT: But he's giving opinions on the billing, I thought.
> [FLORESES' COUNSEL]: And causation.
> THE COURT: So that's different than...
> [OCHOA'S COUNSEL]: Your Honor --
> THE COURT: Well, causation of the injuries. I mean, that's --
> [OCHOA'S COUNSEL]: These are -- *all of his opinions are contained in the medical records*, Your Honor, and so to – *there's nothing outside of the medical records that he's going to offer*.
> [FLORESES' COUNSEL]: Okay. That means he's not going to offer any testimony regarding causation.
> [OCHOA'S COUNSEL]: He offered -- that -- that's in the medical records.

[FLORESES' COUNSEL]: No.
[OCHOA'S COUNSEL]: That's part of his treatment, as part of his --
THE COURT: What's in the -- what particularly are in the medical records?
[OCHOA'S COUNSEL]: The statements about causation and *his probable testimony about causation*. (Emphasis added).

The trial court indicated the objection was overruled at the time but that the Floreses' counsel would be allowed to voir dire Dr. Saenz prior to his testifying to ensure everything was properly disclosed. During the trial, and after concluding his voir dire examination of Dr. Saenz, the Floreses' counsel renewed his objections:

[Appellants' counsel]: My objections are still the same. The -- the plaintiffs didn't solicit the opinions from this expert until last Friday. Clearly that means -- and they haven't disclosed any of those -- those opinions to me, and so clearly that's a Rule 194 violation. These experts should have provided -- the expert should have provided the opinion prior to trial, the basis of the opinions, whatever he reviewed and relied upon in formulating those opinions.

Upon questioning by the court, the Floreses' counsel conceded that he had been provided copies of the documents upon which Dr. Saenz relied in forming his opinions: the chiropractor's referral, Dr. Saenz's medical records regarding Ochoa, and the MRIs. The trial court overruled the objection and allowed Dr. Saenz to testify regarding his opinion on causation.

On appeal, the Floreses complain that the trial court allowed Dr. Saenz, Dr. Runnels and Dr. Vela to testify that Ochoa's medical conditions were caused by the accident despite Ochoa's alleged failure to disclose their opinions in compliance with Rule 194.2(f)(3). In response, Ochoa asserts, just as she did during trial, that

17

her medical records were produced, "and the medical records reflected the providers' assessments of Ochoa, the cause of her injuries, and the treatments necessary to address such injuries."

Ochoa also asserts that by failing to object during trial, the Floreses failed to preserve their arguments with respect to Dr. Runnels's and Dr. Vela's testimony regarding causation. We agree. *See Duff v. Spearman*, 322 S.W.3d 869, 878 (Tex. App.—Beaumont 2010, pet. denied) ("By failing to lodge objections when these witnesses testified, the appellants failed to preserve their complaints concerning the admission of testimony[.]"); see also Tex. R. App. P. 33.1. Although the Floreses objected to Dr. Saenz's testifying about causation, the record does not reveal any such objections to Dr. Runnels's or Dr. Vela's testimony. Therefore, the Floreses first issue is overruled with respect to Dr. Runnels and Dr. Vela.

We now examine Appellee's argument that the trial court abused its discretion in overruling the objection under Rule 194 and allowing Dr. Saenz to testify on causation. Dr. Saenz was not asked, on voir dire or otherwise, whether any of his opinions about causation were contained in his medical records. It is unclear in the record before us if Dr. Saenz had a copy of the medical records from the other medical providers or whether he relied upon those records. Ochoa does not cite any entries in Dr. Saenz's records to support her position that his records contain causation opinions, and the Floreses do not address the actual substance of Saenz's

18

records or whether any entries from the other medical records could be construed as providing the substance of an opinion regarding causation.

That said, we need not determine whether the trial court abused its discretion in overruling the Rule 194 objection and allowing Dr. Saenz to testify about causation because, even assuming without deciding the trial court erred, we conclude any error in the admission of Dr. Saenz's testimony regarding causation was harmless. We "cannot reverse a trial court's judgment based on the erroneous admission of evidence unless the error 'probably caused the rendition of an improper judgment.'" *Jackson v. Takara*, 675 S.W.3d 1, 6-7 (Tex. 2023) (quoting Tex. R. App. P. 44.1(a)(1)). "The complaining party must 'demonstrate that the judgment turns on the particular evidence admitted.' By contrast, the erroneous admission of cumulative evidence or evidence that does not control a material and dispositive issue is generally harmless and thus does not require reversal of the trial court's judgment." *Id*. (quoting *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). Here, Dr. Saenz's causation testimony was cumulative of the causation opinions expressed by Dr. Runnels and Dr. Vela both of whom testified, without objection, that Ochoa's conditions were caused by the March 8, 2019, accident. We overrule the Floreses' first issue.

19

### III. Issue Two

In their second issue, the Floreses challenge the sufficiency of the evidence to support the award of Ochoa's past medical expenses. Specifically, they argue that Ochoa did not meet her burden of proof to prove a causal link between the accident, her claimed medical injuries, and medical treatment.

The Floreses raise legal sufficiency complaints.[3] Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In evaluating whether the evidence in a case is legally sufficient to support a verdict, "we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller*, 168 S.W.3d at 827); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied). A defendant may prevail on a legal sufficiency challenge if the record of the trial shows either: (1) a complete absence of evidence of a vital fact; (2) some rule of law or the rules of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence admitted to the factfinder to prove a vital fact amounts to no more than a mere scintilla to support the verdict; or

---

[3] We note that while Appellants reference both legal and factual sufficiency in their brief, their analysis only addresses legal sufficiency. Therefore, we will address only the legal sufficiency question.

(4) the evidence conclusively establishes the opposite of the fact the factfinder found based on the evidence admitted at trial. *City of Keller*, 168 S.W.3d at 810 (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)).

**Past Medical Expenses**

In challenging the trial court's award of damages for Ochoa's past medical expenses, the Floreses argue that Ochoa offered no medical testimony establishing that the charges for medical treatment Ochoa received for her injuries were directly caused by the acts or omissions of the Floreses. Appellants argue in the alternative that even if Saenz, Runnels and Vela's testimony was not admitted in error, "the evidence was legally insufficient to support the trial court's judgment."

The Supreme Court of Texas noted in *Guevara v. Ferrer* that "[i]n personal injury cases, trial evidence generally includes evidence of the pre-occurrence condition of the injured person, circumstances surrounding the occurrence, and the course of the injured person's physical condition and progress after the occurrence." 247 S.W.3d 662, 666–67 (Tex. 2007). The Court explained that lay testimony about a pre-accident condition or other events leading up to the accident, the accident, the police officer's accident report, and medical treatments after the accident may be evidence that establishes a sequence of events proving a strong, logically traceable connection between the accident and the injury. *See id*. at 667. That kind of evidence

may be sufficient to support causation findings between the accident and the injuries which "(1) are within the common knowledge and experience of laypersons, (2) did not exist before the accident, (3) appeared after and close in time to the accident, and (4) are within the common knowledge and experience of laypersons, caused by automobile accidents." *Id*. In *Guevara*, the evidence was insufficient to provide a causal link. *Id*. at 669 ("Nor do the few medical records for admission and consultation by physicians several months after the accident provide the causal link."). The Court noted that the histories were neither consistent with each other nor with the testimony as to the pre-accident condition. *Id.* at 669, n.4. Conditions beyond the general knowledge and experience of jurors require expert testimony to demonstrate a causal link between the accident and the claimed condition. *Lara v. Bui*, No. 01-21-00484-CV, 2023 Tex. App. LEXIS 1269, **17-18 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (mem. op.). In *Lara*, our sister court explained the following regarding the sufficiency of expert testimony to establish causation.

> To constitute competent evidence of causation, a medical expert's opinion must rest in reasonable medical probability. This rule applies whether the opinion is expressed in testimony or in a medical record, as the need to avoid opinions based on speculation and conjecture is identical in both situations. [The doctor's] opinion is not competent evidence of causation because her opinion is conclusory. An expert's bare proclamation that this one event caused another is not enough to establish causation; the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented. [The doctor's] note does not provide the necessary link between [the Plaintiff's] diagnosed injuries and the motor vehicle

22

> accident. Absent this link, the note is unreliable speculation, which does not constitute legally sufficient evidence to support the jury's verdict.

*Id*. (internal quotations and citations omitted) (explaining a note that stated "Due to clinical exams and diagnostic studies, it is my personal opinioned [sic] that [the Plaintiff's] injuries was the direct cause of the accident sustained on 9/2/2016[]" was not enough to establish a causal connection of the injuries from the accident).

"An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." Tex. R. Evid. 703. "When an expert's opinion is predicated on a particular set of facts, those facts need not be undisputed." *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 144 (Tex. 2016). "An expert's opinion is only unreliable if it is contrary to actual, undisputed facts." *Id.* "'The weakness of facts in support of an expert's opinion generally go to the weight of the testimony rather than its admissibility.'" *In re Fire Alarm Servs., Inc*., No. 04-22-00160-CV, 2022 WL 2820936, at *3 (Tex. App.—San Antonio July 20, 2022, orig. proceeding) (mem. op.).

The presence of a medical condition before an accident may complicate a causation connection and require expert evidence to support causation. *See Guevara*, 247 S.W.3d at 669 ("Those histories do not purport to be diagnoses of Arturo's previously treated conditions nor to relate his conditions prior to the accident."); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995). That a plaintiff has a preexisting condition, however, does not absolve the defendant of

23

responsibility for an aggravation of the preexisting condition caused by the accident. *See Coates v. Whittington*, 758 S.W.2d 749, 752 (Tex.1988) (orig. proceeding) ("[A] tortfeasor takes a plaintiff as he finds him."). And expert evidence may take the form of expert diagnoses based on reasonable probability contained in properly admitted medical and hospital records. *See Crye*, 907 S.W.2d at 500; *see also In re Wheeler*, No. 09-22-00251-CV, 2022 WL 3908531, at *1 (Tex. App—Beaumont Aug. 31, 2022, no pet.) (mem. op.) ("[Plaintiff's] failure to inform his doctors that he was treated for prior back pain or prior injuries is something that the defendant can cross-examine the doctors about and is a factor for the finder of fact to consider when determining the weight to give the doctors' opinions, but it does not necessarily mean the opinions are unreliable and inadmissible under Rule 702.").

The jury here had medical testimony from multiple witnesses and testimony from Ochoa, and the jury also had a copy of Ochoa's post-accident medical records. The medical records and Ochoa's testimony provide some information about her pre-accident and post-accident condition. *See, e.g., Figueroa v. Davis*, 318 S.W.3d 53, 60–61 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Ochoa's medical providers testified about the causation of her injuries.

Saenz opined that the accident caused Ochoa's injuries.

Q. Okay. Do you have an opinion as to what that event was that caused her pain?

24

A. Well, in my opinion, it was caused by her injury on March 8th of 2019.

Q. And when you say "injury," you mean the car accident on March 8th, 2019?

A. That's correct.

Q. And how did you arrive at that opinion?

A. That was based on the history and physical, that was based on the exam, that was based on imaging findings, and kind of putting everything collectively together.

[…]

Q. Doctor, to determine whether or not the March 8 accident caused the herniation or the slip and fall, you would need to compare the MRI from the slip and fall with the MRIs from the auto accident; wouldn't you?

A. No, not necessarily. Again, it's based on history and physical. Even if you had a prior herniation, if it wasn't active, it wasn't hurting, and all of a sudden she had another accident, so it's either -- if there was something there before which I hadn't seen, but she had another injury to it. Then she either exacerbated or made it worse if there was something there previously. So --

Q. You would need -- go ahead. I'm sorry.

A. Well, if -- even if there was an MRI report previously, it might help you but it wouldn't change my opinion, just based on an MRI. Again, my opinion is based more -- it's more on my history and my physical. The MRI just helps me a little bit.

Q. Okay. So based on the methodology that you're using, the MRI comparison between the slip and fall accident and the auto accident wouldn't change your opinions.

A. It would not change my opinion, no.

25

Runnels testified to the following.

> Q. Was it your opinion that the March 8, 2019, collision caused the -- the pain complaints that Ms. Ochoa had?

> A. That's -- that's my opinion, yes, that her injuries are consistent with people that have had -- our other patients that we've, again, treated over the last so many years, it's consistent with people that have been in a similar collision to what she described.

Vela stated the following regarding causation.

> Q. Did you also form an opinion as to the cause of her injuries that -- that she was complaining about?

> A. Yes. I thought it was directly related to the accident on March 8th of 2019.

> […]

> Q. Okay. What's the basis of your opinion that the March 8th, '19, auto accident caused her injuries?

> A. Well, one is, you know, she had an auto accident, and I've been doing this for 20 years. So I've seen cervical sprain/strains and injuries like this all the time. Two is she told me what happened, that she had an auto accident, and she didn't have any pain before that.

> […]

> Q. And that's your basis that the accident caused her injuries. Correct?

> A. No. My basis is done on my history and my examination.

> Q. Okay. And your history was what?

> A. That she had a car accident, that -- that she was injured during the car accident, that she has neck pain, back pain, and then she had the MRIs to prove that there was significant damage done.

26

Q. Were you aware that she had a prior incident?

A. No. No, I was not.

Finally, the jury heard testimony from Ochoa regarding the accident, her history, injuries, and activity level before and after the accident. The jury's implied finding that the evidence provided a causal link between the accident and the stipulated amount for post-accident medical treatment until the time of trial is not so against the great weight and preponderance of the evidence to be clearly wrong and unjust. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *see also Guevara*, 247 S.W.3d at 666–67.[4] We overrule the Floreses second issue.

## IV. Issue Three

In their final issue, the Floreses challenge the trial courts award of costs, arguing "[o]nly taxable court costs can be awarded as costs in a Judgment; Plaintiff's litigation expenses are not recoverable court costs." Appellant contends that court costs means "the clerk's bill of costs" including clerk's fees, service fees and court reporter fees, not a party's litigation expenses.

Ochoa claims this issue was not preserved for appellate review because Appellants did not lodge any objections to the proposed judgment and did not raise the issue in their motion for new trial. "Failure to file a motion to modify or retax

---

[4] We note that Ochoa was awarded $10,000 in Past Mental Anguish and $45,000 in Past Physical Impairment. The Floreses do not challenge those awards on appeal.

27

costs results in a waiver of the right to complain on appeal." *PM Holdings, LLC v. Song*, No. 14-15-00933-CV, 2017 Tex. App. LEXIS 1668, at \*16 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, no pet.) (mem. op.) (citing *Jackson v. LongAgriBusiness*, L.L.C., 2013 Tex. App. LEXIS 113, \*6 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (mem. op.), and *Wright v. Pino*, 163 S.W.3d 259, 261-62 (Tex. App.—Fort Worth 2005, no pet.). However, the record reflects that Appellants filed a post-trial motion on October 5, 2021, styled as Defendants' Motion to Vacate Final Judgment, Motion to Modify Judgment, and Motion for New Trial. Therein, the defendants specifically complained of the inclusion of non-taxable costs in the judgment and asked the trial court to modify the judgment so as to include only those costs included in the clerk's bill of costs. The trial court denied the motion, thereby preserving the issue for appellate review. Tex. R. App. P. 33.1(a).

Texas Rules of Civil Procedure 149 and 622 require the clerk, not the court, to prepare an itemized bill of costs upon request. "[T]he taxing of these costs is a ministerial duty of the clerk, who fulfills that duty by filing a bill of costs in the record." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, No. 03-10-00826-CV, 2014 Tex. App. LEXIS 12391, \*11 (Tex. App.—Austin, Nov. 14, 2014, no pet.) (mem. op.). *See also*, *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, No. 01-17-00671-CV, 2019 Tex. App. LEXIS 2222, at \*48 (Tex. App.—Houston [1st Dist.] Mar. 21, 2019, no pet.) (mem. op.). "In response to a request for

28

an award of costs, the court's role is to determine which party or parties is to bear the costs of court, not to adjudicate the correctness of specific items." *Pitts v. Dallas Cnty. Bail Bond Bd.*, 23 S.W.3d 407, 417 (Tex. App.—Amarillo 2000, pet. den'd); *see also*, *Williams v. Colthurst*, 253 S.W.3d 353, 362-63 (Tex. App.—Eastland 2008, no pet.).

"Texas Civil Practice and Remedies Code section 31.007(a) requires the successful party to submit a record of its court costs to the court clerk so that the clerk can perform its ministerial duty and tax costs in accord with Texas Rule of Civil Procedure 622." *Madison v. Williamson*, 241 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. den'd). "The trial court should state in its judgment which party is to pay costs. The judgment should not state the amount taxed as costs, but only that costs are awarded against a certain party. Taxing costs, as distinguished from adjudicating those costs, is merely a ministerial duty of the clerk." *Id.* (citations omitted). *See also*, *Reaugh v. McCollum Expl. Co.*, 167 S.W.2d 727, 728 (Tex. 1943) (holding the taxing of costs is the ministerial act of the clerk, not an adjudication by the court as to specific items).

"Generally, in Texas, expenses incurred in prosecuting or defending a lawsuit are not recoverable as costs, unless permitted by a statute or equitable principle." *Sterling Bank v. Willard M, L.L.C.*, 221 S.W.3d 121, 125 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Texas Civil Practice and Remedies Code § 31.007(b) states:

"A judge of any court may include in any order or judgment all costs, including the following:

    (1) fees of the clerk and service fees due the county;

    (2) fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit;

    (3) masters, interpreters, and guardians ad litem appointed pursuant to these rules and state statutes; and

    (4) such other costs and fees as may be permitted by these rules and state statutes."

Tex. Civ. Prac. & Rem. Code Ann. § 31.007(b).

Texas Rules of Civil Procedure 131 provides, "The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." Tex. R. Civ. P. 131. Rule 141 provides, "The court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules." Tex. R. Civ. P. 141.

While Rule 141 has been interpreted to mean that a trial court may adjudge costs against a party other than the prevailing party, if it has good cause to do so, the power to allocate costs does not encompass the power to tax as costs items that are not allowed as taxable court costs. *See Premcor Pipeline Co. v. Wingate*, No. 09-22-00117-CV, 2024 Tex. App. LEXIS 2529 at **46-47, 2024 WL 1565334 (Tex. App.—Beaumont Apr. 11, 2024, no pet.) (mem. op.); *Gumpert v. ABF Freight Sys. Inc.*, 312 S.W.3d 237, 242 (Tex. App.—Dallas 2010, no pet.) (the power to allocate

30

costs does not encompass the power to tax as costs items that are not allowed as taxable court costs); *May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("[T]he power to allocate costs does not encompass the power to tax as costs items that are not allowed as taxable court costs."); *Bundren v. Holly Oaks Townhomes Ass'n, Inc.,* 347 S.W.3d 421, 440 (Tex. App.—Dallas 2011, pet. denied) (generally, in Texas, expert fees are not recoverable as court costs).

After trial, Ochoa submitted a Motion for Entry of Judgment, seeking an award of $14,277.74 in "taxable court expenses." Ochoa attached exhibits to her Motion for Entry of Judgment to support her calculation of taxable costs including a list of "Client Expenses," and copies of invoices, statements, and receipts. Assuming without deciding Ochoa's list of "Client Expenses" were supported by proper documentation, it was error for the court to include litigation expenses--such as "handling expense," copies of records, and expert witness fees for deposition or court appearances, or other items ordinarily not allowed as taxable court costs--in its award of taxable costs. Moreover, as stated above, the judgment should not have included a dollar amount for taxable costs, since it was the trial court's role only to tax costs in Ochoa's favor, and it was the clerk's ministerial role to prepare a bill of costs including only those items authorized by Texas Civil Practice and Remedies

31

Code § 37.001. We sustain Appellants' third issue and remand this issue to the trial court.

## V. Conclusion

We overrule Appellants' first two issues and affirm the trial court's judgment in part, but we sustain the Appellants' third issue regarding the amount of taxable court costs and reverse and remand the matter to the trial court to revise the judgment consistent with this opinion.

AFFRIMED IN PART; REVERSED AND REMANDED IN PART.


JAY WRIGHT
Justice

Submitted on August 17, 2023
Opinion Delivered August 8, 2024

Before Johnson, Wright and Chambers, JJ.

32